**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 20-20270-CR-GAYLES/TORRES

UNITED STATES OF AMERICA,

     Plaintiff,

v.

SAMANTHA STEVENS,

     Defendant.

_____/

**REPORT AND RECOMMENDATION**
**ON DEFENDANT'S MOTION TO DISMISS**

This matter is before the Court on Samantha Steven's ("Defendant" or "Stevens") second motion to dismiss the United States of America's (the "Government") indictment pursuant to Federal Rules of Criminal Procedure 12(b)(3). [D.E. 61]. The Government responded to the original motion on December 14, 2021 [D.E. 44], to which Defendant filed a reply on December 22, 2021 [D.E. 49]. Thereafter, the government filed a superseding indictment that clarified the allegations against Defendant (following a hearing held on the original motion) which was filed February 16, 2022. [D.E. 59]. The government supplemented its response in light of that superseding indictment. [D.E. 60]. Defendant replied to that supplement at the Court's direction on March 2, 2022. [D.E. 68].

Therefore, Defendant's second motion to dismiss is now ripe for disposition (the original motion being denied as moot). That motion to dismiss is predicated on the argument that the superseding indictment still fails to allege a viable wire fraud case

against this Defendant.   After careful consideration of the second motion, responses/replies, relevant authorities, and for the reasons discussed below, Defendant's motion to dismiss should be DENIED[1]

## I.   BACKGROUND

This case involves a religious psychic trying to break a family curse by "cleaning" "dirty" money.  Far-fetched as that might be, the Government has chosen to make a federal case out of it.  And not just any federal case; a criminal wire fraud and money laundering case against the self-professed psychic, Defendant Stevens. Defendant squarely takes aim at the government's indictment, however, as an assault on a wide range of religious evangelism for profit in America, despite the fact that such profit-making enterprises are now ubiquitous.  Defendant fancies herself as a religious prophet and follower who believes in her psychic abilities and carried through on her promises.   Defendant thus challenges the legal validity of the indictment and argues that it represents selective prosecution on the government's part in favor of one type of religious activism while trying to criminalize her own unique beliefs.

It is undoubtedly true that millions of religious faithful, in reliance on messages communicated by wire and mail through channels of interstate commerce, contribute millions (if not billions) of dollars to religious institutions and enterprises (non-profit entities that do not pay taxes on those millions) on the belief that, directly

---

[1]   On November 23, 2021, the Honorable Darrin P. Gayles referred Defendant's original motion to the undersigned Magistrate Judge for disposition.  [D.E. 32].  The second motion was also referred on February 24, 2022. [D.E. 64].

or indirectly, their efforts will prove to be fruitful and worthwhile.  After all, if one believes in God, one may also believe that religious prophets are worth investing in as symbols or agents of one's God who do God's work here on earth.

Ordinarily, a humanist or atheist, however, would see things very differently.  They would say that anyone who buys that religious message with monetary strings attached is foolish or gullible or naïve.  They would say that one who contributes money to a religious prophet, in the hope that God will be more merciful towards them or bestow upon them some favor or benefit, has been defrauded.

Ordinarily, especially in our country where the First Amendment is sacrosanct in its protection for those who exercise or believe in religion, the government is not supposed to come down on one side or the other of this fundamental debate.   So what makes this case different?  Has the government arguably come down on the side of a non-believer by seeking to criminalize a non-traditional religious-based practice even though religious profiteering by established religions are purportedly carried out every day? The government persuasively argues that, unlike religious-based pleas for money or tithes from religious believers as a whole, this is a case about fraud directed at a specific individual target with intent to harm that victim.  So unlike a universal appeal for religious faithful to contribute to the cause, this case is about a direct fraudulent conspiracy for pecuniary gain under the guise of religious practice.

We review the facts supporting the indictment in that light that is most favorable to the government. The grand jury alleges (and we thus assume to be true) that Stevens is a self-proclaimed psychic and spiritual healer.   Specifically, the

superseding indictment alleges that Stevens "represented herself as a psychic and spiritual healer able to remove curses to assist clients with personal difficulties." [D.E. 59 ¶ 1].   We know from the government's response that the victim in the fraudulent scheme, Ilena Torruella, first met Stevens at her psychic booth over 15 years ago.   The two began to socialize and would meet occasionally at various Catholic churches in the Miami area.   Torruella shared her family problems with Stevens during these encounters. Stevens explained to Torruella that she was cursed due to her possession of "dirty" family money.  Stevens offered to break the curse by "cleansing" the money and showing God that Torruella was not attached to it.  The grand jury alleges that by doing so Stevens was falsely representing herself as a psychic with such powers and that "if [Torruella] failed to provide the money bad things would continue to happen to her and her family.   Through these representations, Stevens falsely and fraudulently induced [Torruella] to provide her with millions of dollars to purportedly cleanse the money and remove the curse." [D.E. 59 ¶5].

In reliance on these false pretenses, Torruella then gave Stevens over $2 million dollars over several transactions during the course of three years, all in exchange for Stevens cleansing the money and having the curse removed.  The first payment occurred on September 19, 2013, when Torruella gave Stevens $1,600,000 in the form of eight $200,000 cashier's checks.  Months later, Stevens told Torruella that the ritual was unsuccessful, and Torruella would need to give her additional money to break the curse by performing a second ritual. [D.E. 59 ¶8].

Torruella then gave Stevens additional money to clean in the form of (1) four $200,000 cashier checks on October 6, 2014, (2) four $50,000 personal checks on December 31, 2014, (3) a $160,000 wire transfer on April 30, 2015, and (4) a $420,000 wire on January 21, 2016.    After the January 2016 wire, Stevens stopped communicating with Torruella, despite reaping $3,198,000 from the fraudulent scheme. [D.E. 59 ¶11].  Rather than returning the "cleansed" money, Stevens, along with her ex-husband, Michael Guzman, kept Torruella's money and used much of it to fund trips to Las Vegas to gamble, to purchase a Coconut Grove condo, and to buy expensive vehicles.

Notably, the superseding indictment does not allege that Stevens made a direct promise to the victim that the "cleansed" money would ultimately be returned to the victim.  But the government argues that the indictment reflects probable cause that Stevens knew the victim impliedly understood that the money would be cleansed and returned based on the nature of the transaction coupled with Stevens's understanding that the money was needed for financial support for the victim's mother.  The grand jury also found that there was probable cause Stevens never intended to return the money given that she quickly spent the monies for her personal use before the victim could ever ask for it back.  And when the victim tried to do so, Stevens ceased all further communication with her.  This is fraud because the perpetrator intended to defraud the victim of her property with the specific intent never to return the cash the victim assumed she would get back.

The path that led to this indictment began in 2016, when Torruella told the Federal Bureau of Investigations about the fraud, but it did not investigate the case. Torruella also went to the Miami Police and the Coral Gables Police departments, but they did not investigate the case. Torruella then sat for an interview with the Internal Revenue Services, but no charges came from that interview. In January 2020, Torruella met again with agents from the IRS and provided additional details about her relationship with Stevens.

After renewed investigation, on December 15, 2020, the government finally decided to bring charges against Stevens and Guzman. [D.E. 3, 59]. Defendant is charged by superseding indictment with two counts of wire fraud (for last two wires sent by Torruella to Stevens in 2016), in violation of 18 U.S.C. § 1343; Defendant and Guzman for one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); and Defendant and Guzman for eight counts of money laundering in violation of 18 U.S.C. § 1957. *Id.* The money laundering charges all relate to cleansing the funds received by Stevens from Torruella. *Id.*

Stevens seeks to dismiss the indictment for three reasons: (1) the indictment fails to state a claim because Torruella received exactly what she bargained for because there was never a request or a promise to return the money; (2) the conduct alleged in the indictment is protected by the Religious Freedom Restoration Act and the free exercise of religion and the free speech clauses of the First Amendment to the United States Constitution; and (3) the Government is selectively prosecuting her

over other similarly situated religious activities that are not, in violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution.

## II.    APPLICABLE PRINCIPLES AND LAW

Fed. R. Crim. P. 7(c)(1) requires that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Under Fed. R. Crim. P. 12(b)(1), "[a] party may raise by pretrial motion any defense, objection or request that the court can determine without a trial of the general issue." A motion alleging a defect in the indictment must be raised before trial, unless the defect is regarding the district court's lack of jurisdiction or failure to state an offense, which may be brought at any time while a case is pending. *See United States v. Baxter*, 579 F. App'x 703, 705 (11th Cir. 2014) (citing Fed. R. Crim. P. 12(b)(3)(A)-(B)).

An indictment is sufficient if it: "(1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *Id.* (quoting *United States v. Steele*, 178 F.3d 1230, 1233-34 (11th Cir. 1999)). A court must determine the sufficiency of an indictment from its face and "may not dismiss an indictment based on a determination of facts that should have been developed at trial." *Id.* (citing *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004); *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006)).

Indeed, the Eleventh Circuit has held that there is "no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of

the sufficiency of the evidence." *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992); *see also Salman*, 378 F.3d at 1268 ("A motion for acquittal under Rule 29 is the proper avenue for contesting the sufficiency of the evidence in criminal cases because there is no explicit authority to grant a pre-trial judgment as a matter of law on the merits under the Federal Rules of Criminal Procedure."). An indictment that charges a defendant in the language of the relevant statute is sufficient "as long as it also provides a statement of facts and circumstances that give notice of the offense to the accused." *United States v. Jordan*, 582 F.3d 1239, 1246 (11th Cir. 2009) (quotation omitted).

To establish wire fraud, the Government must prove that a person: "(1) intentionally participate[d] in a scheme or artifice to defraud another of money or property, and (2) use[d] or 'cause[d]' the use of the mails or wires for the purpose of executing the scheme or artifice." *United States v. Langford*, 647 F.3d 1309, 1320 (11th Cir. 2011). To prove that a defendant had the intent to defraud, the Government has to prove that a defendant either knew they were making false representations or acted with "reckless indifference to the truth." *United States v. Simon*, 839 F.2d 1461, 1466, 1470 (11th Cir. 1988). A statement or representation is false or fraudulent if it relates to a material fact and is known to be untrue or is made with reckless indifference as to its truth or falsity and is made or caused to be made with intent to defraud. *E.g., United States v. Neder,* 197 F.3d 1122, 1128 (11th Cir. 1999). A statement or representation may also be false or fraudulent when it constitutes a half truth or effectively conceals a material fact, provided it is made

with intent to defraud. *E.g., United States v. Gray,* 367 F.3d 1263, 1271 (11th Cir. 2004). And the Government must prove more than deceit; it must prove that the defendant intended to deprive the victim of something of value. *See United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016).

## III.   *ANALYSIS*

### A.   *The Indictment Sufficiently Alleges a Scheme to Defraud*

The key point Defendant relies upon to seek dismissal of this indictment is that Stevens never expressly promised to return Torruella's money and Torruella never directly asked whether it would be returned before turning over her funds to Stevens. Absent such allegations, Stevens insists that the indictment cannot allege a scheme to defraud. Without an express agreement or promise to return the money, Stevens concludes that Torruella received exactly what she bargained for. The money was cleansed when Torruella gave it away. And she did so in the absence of a direct misrepresentation from Stevens. Hence there can be no fraud as guided by the Court's reasoning in *Tahkalov* that " [the jurors] must acquit if they found that the defendants had tricked the victims into entering a transaction but nevertheless gave [them] exactly what they asked for and charged them exactly what they agreed to pay"). 827 F.3d at 1310. That decision also explained that "that [the jurors] could convict only if they found that the defendants had schemed to lie about the quality or price of the goods sold to the victims." *Id.* at 1316.

The first problem with this reasoning is that it is anchored to unabashed dicta in an opinion that merely held that failure to give a very different instruction was

reversible error.  As Chief Judge Pryor explained in a decision upholding a wire fraud conviction on remand from *Tahkalov* and stemming from the same fraudulent scheme, *Takhalov* "held that the district court reversibly erred when it declined the defendants' request for the following jury instruction: 'Failure to disclose the financial arrangement between the [alleged co-conspirators], in and of itself, is not sufficient to convict a defendant of any offense.'" *United States v. Feldman,* 931 F.3d 1245, 1267 (11th Cir. 2019) (quoting *Tahkalov*, 827 F.3d at 1311 (alterations omitted or adopted) (Pryor, C.J., concurring in his opinion for the Court).

Notably, the panel decision in *Feldman* affirmed a conviction for a scheme to defraud involving the defendant who "invested in two Miami Beach nightclubs that hired foreign women to pose as tourists, attract patrons, and persuade them to buy drinks without paying attention to the clubs' exorbitant prices." 931 F.3d at 1250. The indictment in that case alleged "a panoply of deceptive or underhanded tactics that the B-girls and bartenders [nightclub employees] used to increase the customers' bills and to keep them unaware of the charges they were incurring: for example, hiding menus, ordering drinks without the customers' knowledge, ignoring customers' inquiries about prices, lying about prices, hiding the amount on a receipt when requesting a customer's signature, forging customers' signatures, encouraging customers to drink themselves into a stupor, and serving the B-girls shot glasses filled with water when the customers thought they were ordering vodka shots." *Id.* at 1250-51.  The defendant investor claimed, like Stevens does here, that he never made any representation against the bar customers directly and his employees only gave

the alleged victim the drinks they had ordered and never lied to them about the prices they cost. *Id.* at 1258. So, citing *Tahkalov's* dicta, that defendant argued no fraud could be sustained.

But the district judge and the unanimous panel on appeal disagreed. "A rational jury could have inferred from [the cooperator's] testimony that once a patron provided his credit card to a bartender, it was a foregone conclusion that the club would charge it to the credit limit or to as near the credit limit as possible, no matter how many drinks the patron actually ordered. . . . [This was] a scheme to commit what qualifies as fraud under any interpretation of the wire-fraud statute, and [the witness] testified that Feldman knowingly participated in that scheme." *Id.*

Most significantly, for our purposes, Chief Judge Pryor concurred in his own panel opinion to expressly caution district judges from over-reading or relying on the dicta in *Tahkalov* and failing to follow well-established line of older binding cases establishing the intended breadth of the wire fraud statute:

> I encourage the bench and bar to evaluate carefully the precedential value of *Tahkalov* in future prosecutions under the fraud statutes and, in doing so, to keep three principles in mind. First, the binding force of a precedent is limited to its holding, and "regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case." . . . Second, the holding of any panel decision must be construed, "if at all possible," in a manner that maintains the harmony of our precedents. . . . Third, even the holding of a panel decision is not binding precedent if it contradicts the holdings of earlier panel precedents or intervening decisions of the Supreme Court.

*Id.* at 1273 (citations omitted).

In reaching this cautionary conclusion, Chief Judge Pryor persuasively challenged the legal underpinnings for the *Tahkalov* dicta on a point-by-point basis

that showed how, if read literally, those broad strokes ignored binding precedent in the circuit that do not limit scheme to defraud convictions solely to misrepresentations targeting the nature of the bargain or the price of the good. *See, e.g., id.* at 1266 ("the words 'to defraud' in the federal fraud statutes 'signify the deprivation of something of value by trick, deceit, chicane or overreaching'; in other words, '[t]hey refer . . . to wronging one in his property rights by dishonest methods or schemes.' Indeed, the only way in which the phrase 'scheme or artifice to defraud' differs from actionable fraud at common law follows from the phrase itself: because the statutes address 'the 'scheme to defraud,' rather than the completed fraud, the elements of [actual] reliance and damage would clearly be inconsistent with the statutes Congress enacted.' ") (quoting in part *Hammerschmidt v. United States,* 265 U.S. 182, 188 (1924) and *United States v. Neder*, 527 U.S. 1, 25 (1999)).

Second, if we follow those traditional established lines of cases broadly interpreting the wire fraud statute, the motion to dismiss is due to be denied. The grand jury is charging Stevens with engaging in deceit and chicanery in luring the victim to hand over her funds. The victim may testify that she interpreted the whole cleansing operation as one that would result in the return of cleansed funds. She may testify that she based that conclusion on what Stevens alleged she would do with the funds. And the jury may find that Stevens engaged in this operation with the intent to defraud the victim, either by first never engaging in any psychic activity in the first place, or even if she did by then no returning the funds to the purchaser of Stevens's religious skills.

In either case, the grand jury is alleging a scheme to defraud based on what Stevens intended.  That is entirely consistent with the manner in which the federal fraud statutes have been applied. "[T]he words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *McNally v. United States,* 483 U.S. 350, 358 (1987) (quoting *Hammerschmidt*, 265 U.S. at 188). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales,* 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)).  So the statute's use of the word "any" without limiting language should be read to mean "all." *See id.*

Hence, whether a defendant has schemed to defraud—and thus violated the fraud statutes—does not depend on the success of his scheme or its consequences. Instead, the object of the statute focuses on the criminal intent of the perpetrator.  As the Supreme Court explained in an early case interpreting the wire fraud statute, the prohibition of mail or now wire fraud "includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *Durland v. United States,* 161 U.S. 306, 313  (1896).  The defendant in that case  had been convicted of mail fraud and argued that the statute reached "only such cases as, at common law, would come within the definition of 'false pretenses,'" which would mean that "there must be a misrepresentation as to some existing fact, and not a mere promise as to the future." *Id.* at 312. But the Supreme Court squarely rejected

that argument because the statute reached "any" fraud and the object of the criminal prohibition is the intent of the malefactor, not the reasonableness of the victim:

> We do not wish to be understood as intimating that, in order to constitute the offense, it must be shown that the letters so mailed were of a nature calculated to be effective in carrying out the fraudulent scheme. It is enough if, having devised a scheme to defraud, the defendant, with a view of executing it, deposits in the post office letters which he thinks may assist in carrying it into effect, although, in the judgment of the jury, they may be absolutely ineffective . . . .

*Id*. at 315.

This interpretation was expressly adopted in later iterations of the mail and wire fraud statute.  Thus our circuit has followed all the other circuits and now holds that "a fanciful scheme may nonetheless be a scheme to defraud." *Svete*, 556 F.3d at 1162 (citing *United States v. Stever,* 222 U.S. 167, 174 (1911) ("A scheme to defraud by means of false pretenses is . . . a 'scheme or artifice to defraud,' within the plain meaning and purpose of this section.")).  This means that "[p]roof that a defendant created a scheme to deceive reasonable people is sufficient evidence that the defendant intended to deceive, but a defendant who intends to deceive the ignorant or gullible by preying on their infirmities is no less guilty. Either way, the defendant has criminal intent." *Id*. at 1165 (en banc opinion overruling *United States v. Brown,* 79 F.3d 1550 (11th Cir. 1996) (holding that mail fraud requires proof of a scheme to defraud that is objectively reliable by a person of ordinary prudence unless the defendant is a fiduciary of the intended victim)).

Here, there can be little dispute that the grand jury has alleged a fanciful scheme to defraud that, frankly, may not survive review if *Brown* was still good law

in this circuit because a person of ordinary prudence would not, and could never, believe that anyone like Stevens could "cleanse" money as she promised.  But a fanciful scheme can once again still be a basis for fraud.  *See also United States v. Mendez*, 737 F. App'x 935, 942 (11th Cir. 2018) (a victim's "negligence does not vitiate a fraudster's criminal intent[.]").  And the government intends to show, based on this indictment, that Stevens never intended to cleanse any money based on how she immediately converted the funds for her own benefit immediately upon gaining access to them.  That, the government posits, is at least circumstantial evidence that the jury could rely upon that Stevens never intended to "perform" and instead made false representations as to her so psychic abilities to lure the victim.  After all, wire fraud may be proven by circumstantial evidence.  *See United States v. Martin,* 803 F.3d 581, 588 (11th Cir. 2015).  A jury may infer the "intent to defraud" from the defendant's conduct and circumstantial evidence.  *See, e.g., United States v. Maxwell,* 579 F.3d 1282, 1301 (11th Cir. 2009). Evidence that the defendant personally profited from a fraud may provide circumstantial evidence of the intent to defraud a target of a scheme. *See, e.g., United States v. Naranjo,* 634 F.3d 1198, 1207 (11th Cir. 2011).

And even if the government could not actually prove that she did or did not have any special abilities in the first place, Stevens intended to trick the victim to turn over her money on the false promise, express or implied, that funds would be returned once cleansed.  That is a scheme to defraud in its plainest sense.

In short, if Stevens is right and the victim knew that the money would never be returned to her, then the jury may acquit at trial based on a lack of materiality.

*See, e.g., Neder,* 527 U.S. at 25 ("materiality of falsehood is an element of the federal . . . fraud statutes"). But that is an issue for trial. On a motion to dismiss, we are not charged with a summary judgment-type analysis of the indictment and the government's case. "In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes." *Sharpe,* 438 F.3d at 1263. "There is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of sufficiency of the evidence." *Critzer,* 951 F.2d at 307.

So notwithstanding Defendant's potentially persuasive defenses, the motion must be Denied. This superseding indictment "(1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *Jordan,* 582 F.3d at 1245 (quotation omitted).

Finally, we address another argument raised by Defendant's motion. Stevens contends that, at best, the indictment could sustain a conviction under the wire fraud statute only if a "special relationship" existed between Stevens and the victim. Only in that case, Stevens argues, could a fraud conviction be sustained on non-disclosure of material facts. Here, the most that could be said of Stevens is that she did not disclose that she would never return the money from the victim and did not disclose that she intended to use the money for personal uses like trips to Las Vegas. But this indictment does not give rise to such a theory. *See, e.g., United States v. Steffen*, 687

F.3d 1104, 1114, 1117 (8th Cir. 2012) (affirming the dismissal of a wire fraud charge because the Government failed to sufficiently allege a scheme to defraud as "mere silence" by a defendant with no "independent legal duty to disclose" "does not give rise to an action in fraud").

Yet, at the same time, the motion is premised on religious prosecution. Stevens stakes out a claim that she is the victim of the government's attempt to regulate her religious views, which the government is seeking to criminalize based on its content. Stevens's motion argues that this indictment "proposes to criminalize Ms. Stevens' words, solely by defining them as untrue. This content-based regulation, which is not narrowly tailored to actual fraud, but instead criminalizes Ms. Stevens' expressive conduct, reeks of government overreach and is a violation of Ms. Stevens' right to freedom of speech." [D.E. 61 at 18].

Stevens forgets, however, that a well recognized type of "special" or "fiduciary" relationship is one between religious leader and follower, such as a priest to parishioner. Or to put it more specifically, a jury may find that Stevens indeed maintains a special relationship with her victims/followers based on her advisory and caretaker role as spiritual healer who practices within the Roma culture's brand of Catholicism. According to Stevens, the "meetings held between Ms. Stevens and the complaining witness happened primarily in Catholic churches. The rituals were performed with holy water. Other religious figures, including the 'Mother Superior' and 'Father' were a part of the organization and the rituals. Indeed, the complaining

witness regularly refers to her involvement with the group and with Ms. Stevens as involvement with 'the church.' " [D.E. 61 at 19-20].

Given Stevens's own account of how her dealings with the victim were conducted, she herself is conceding that there was a religiously-protected special confidential relationship between Stevens and Torruella.   Under Florida law, for instance, such a relationship is deemed to be confidential and privileged from disclosure in litigation or other similar purposes.  *See* Fla. Stat. § 90.505(1)(b) ("Privilege with respect to communications to clergy.").   Under this privilege recognized and protected by Florida law, a "communication between a member of the clergy and a person is "confidential" if made privately for the purpose of seeking spiritual counsel and advice from the member of the clergy in the usual course of his or her practice or discipline and not intended for further disclosure except to other persons present in furtherance of the communication."

This statutory privilege, which is also consistent with the clergyman's common law privilege, gives rise to a recognized "special relationship" in Florida that supports a cause of action for breach of fiduciary duty when confidential communications, like those between a chaplain and student, are disclosed.  *See, e.g., Woodard v. Jupiter Christian Sch., Inc.,* 913 So. 2d 1188, 1191 (Fla. 4th DCA 2005) ("Taking these well-pled allegations as true for the purposes of the motion to dismiss, the plaintiff has alleged the disclosure of confidential information arising from a special relationship between the student and a member of the clergy."), *appeal dismissed,* 972 So. 2d 170 (Fla. 2007).

Other states have recognized such a special fiduciary relationship in similar cases, including ones where a parishioner is alleging that he/she confided in a Catholic priest, depended on that relationship, and suffered injuries from the breach of that special trust. *See, e.g., Martinelli v. Bridgeport Roman Cath. Diocesan Corp.,* 196 F.3d 409, 430 (2d Cir. 1999) ("We agree with the district court that there was thus sufficient evidence from which the jury could reasonably have found that there existed a special relationship of trust and confidence between [plaintiff/parishioner] Martinelli and not only Father Brett, but the Diocese. It is reasonable for the jury to conclude that Martinelli, through the particular activities in which he was involved, including those which the Diocese sponsored, had a particularly close relationship with the Diocese from which a fiduciary duty might arise. The Diocese, in turn, occupied a superior position of influence and authority over Martinelli."); *Doe v. Liberatore,* 478 F. Supp. 2d 742, 771 (M.D. Pa. 2007) (Pennsylvania law recognizes any fiduciary relationship whenever one person reposes special confidence on another; "This definition fits the relationship of a priest and a parishioner once the priest 'accepts the parishioner's trust and accepts the role of counselor.' ") (quoted citation omitted); *Vega v. Ryan,* 757 F.3d 960, 973 (9th Cir. 2014) ("Arizona law, like many other jurisdictions, has recognized the special relationship between priests and their parishioners."); *cf. Caldwell v. Archdiocese of New York,* 2021 WL 1999421, at *9 (S.D.N.Y. May 19, 2021) (under New York law, sexual abuse by clergy does not per se give rise to special relationship; "To plead a special relationship for purposes of negligent misrepresentation, the 'requisite relationship between the parties must

have existed before the transaction from which the alleged wrong emanated, and not

as a result of it.' ").

A persuasive rationale for the need to recognize this special relationship is

found in a Pennsylvania decision:

> In such a case, the parishioner has justifiably placed his trust in the
> priest. In order to receive and make use of a priest's advice and counsel,
> a parishioner must necessarily depend upon the priest's knowledge and
> expertise, resulting in the priest's superiority and influence over the
> parishioner. Thus, once a counseling relationship has commenced, the
> parishioner and priest no longer deal on equal terms. This unequal
> relationship affords the priest opportunity to abuse the trust and
> confidence reposed in him or prey on a weak and dependent parishioner
> to his own benefit. The relationship therefore becomes fiduciary in
> nature and the recognition of a breach of fiduciary duty claim is
> necessary to protect a beholden parishioner from a self-serving priest.

*Doe v. Liberatore,* 478 F. Supp. 2d at 771–72.

The same analysis has been echoed by the Supreme Court in the context of

federal evidentiary privileges: this well established special relationship and the

privilege that arises therefrom is "rooted in the imperative need for confidence and

trust. The priest-penitent privilege recognizes the human need to disclose to a

spiritual counselor, in total and absolute confidence, what are believed to be flawed

acts or thoughts and to receive priestly consolation and guidance in return." *Trammel*

*v. United States,* 445 U.S. 40, 51 (1980) (comparing priest-penitent privilege with

spousal privilege at issue in that case).

The facts alleged in this indictment present a textbook case for applying and

recognizing a privileged relationship here.  Paraphrasing *Doe,* Torruella placed her

trust in a psychic and spiritual healer based on a relationship that began in a church

setting.  In order to make use of Stevens's advice and counsel, Torruella depended on her knowledge and expertise, "resulting in [Stevens's] superiority and influence over the parishioner."  Thus, once this counseling relationship commenced, Torruella and Stevens "no longer deal[t] on equal terms.  This unequal relationship afforded [Stevens] opportunity to abuse the trust and confidence reposed in [her to] prey on a weak and dependent [Torreulla for her] own benefit."

So, in sum, the government may decide to proceed on either or both of these approaches based on the evidence presented at trial.  The government may seek to prove through circumstantial evidence that Stevens knew that Torruella believed, directly or impliedly, that the cleansed money would be returned.  Torruella made clear that the money was needed to take care of her mother yet transferred additional rounds of funds to Stevens.  The jury can find from this evidence that Stevens knew that she was expected to return the money and failed to do so, even after Torruella made formally demanded the return of her funds.  The jury could find that this constituted a scheme to defraud based on the allegations in the superseding indictment.

The government may also seek to establish a scheme to defraud based on Stevens's half-truths and non-disclosures of material facts.  *See, e.g., United States v. Gray,* 367 F.3d at 1271.  The jury may find that Stevens had a duty to disclose her intent to immediately convert the funds for her personal benefit, given her special relationship with Torruella.  The jury may also find that Stevens did not disclose her intention, from the inception of the relationship, to never return the cleansed funds.

And the government may prove all this without having to prove that, in fact, no religious ritual was ever performed or that Stevens had no spiritual powers in the first place.  The government need only show that, even if Stevens honestly believed she had special powers, she knew she would never actually cleanse the funds and return them to the rightful owner.  By doing so, Stevens deprived the victim of her property with the intent to defraud.  This is punishable under the wire fraud statute. *See, e.g., United States v. Maxwell,* 579 F.3d 1282, 1299 (11th Cir. 2009) (a scheme to defraud requires proof of a material misrepresentation *or* the omission or concealment of a material fact calculated to deceive another person); *United States v. Eyerman,* 838 F. App's 416 (11th Cir. 2020) (scheme to defraud sustained in part by evidence that defendant "immediately spent the money exclusively on personal expenditures like down payments on personal property and gambling[;]" "these expenditures supported the jury's finding that [defendant] intended to defraud [the victim] when he persuaded her to part with her money.").

Accordingly, in the light most favorable to the non-moving party, the motion to dismiss must be DENIED as the allegations of the superseding indictment sufficiently state a viable basis for a conviction under the statute.  And because the superseding indictment is sufficient to support the elements of the wire fraud charges in Counts 1 and 2, this could constitute "specified unlawful activity" to support the conspiracy and money laundering charges as well. *See* 18 U.S.C. § 1957(a)(1).  The motion to dismiss Count 3 through 11 should also be DENIED.

**B. The Indictment Does not Violate Defendant's Statutory or Constitutional Rights to the Free Exercise of her Religious Beliefs**

The second aspect of the pending motion relates to Stevens's claim that the indictment violates her right to the free exercise of religious, protected by federal statute as well as the First Amendment.  The motion should be Denied as to these claims.

### (1) The Religious Freedom Restoration Act

The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, provides that the government may substantially burden a person's exercise of religion only if it is in the furtherance of a compelling government interest and is the least restrictive means of furthering that compelling interest. *See* 42 U.S.C. § 2000bb-1(b)1&2. The purpose of the Religious Freedom Restoration Act is to restore the "compelling interest test" of *Sherbert v. Verner,* 374 U.S. 398 (1963), when determining the constitutionality of governmental regulation that burdens free exercise of religion. S*ee, e.g., Church of Scientology v. City of Clearwater,* 2 F.3d 1514, 1544 (11th Cir. 1993) (state does have a compelling interest in protecting church members from affirmative, material misrepresentations designed to part them from their money).

Stevens's motion argues that the Government's prosecution of Defendant through the superseding indictment substantially burdens her religious beliefs. A "substantial burden" is (1) government action which significantly inhibits or constrains conduct or expression that manifests some central tenet of a person's individual religious beliefs; (2) meaningfully curtails the ability to adhere to an individual's faith; or (3) denies reasonable opportunities to engage in those activities

that are fundamental to an individual's religion. *See, e.g., Weir v. Nix,* 114 F.3d 817, 820 (8th Cir. 1997) (quoting *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir. 1995)).

If such a showing is made, the burden is on the government to show that (a) it has a compelling interest, and (b) the challenged action in question is the least-restrictive means of furthering that interest. *See, e.g., United States v. Grady,* 18 F.4th 1275, 1285 (11th Cir. 2021). A criminal defendant may rely on the statute as a defense to a criminal prosecution. *Id.* (citing *United States v. Christie,* 825 F.3d 1048, 1055 (9th Cir. 2016); *United States v. Wilgus,* 638 F.3d 1274, 1279 (10th Cir. 2011)).

But as the Eleventh Circuit has also recognized, the RFRA is not a "get out of jail free card." *Grady*, 18 F.4th at 1287. Indeed, "no Supreme Court case supports the destruction of government, or another's, property on free exercise grounds." *Id.* Here, Stevens has not come close to meeting her burden of showing how RFRA warrants dismissal of the superseding indictment. Clearly, the government has a compelling interest to deter fraudulent schemes under the guise of religious activity. But we need not examine the particular contours of that interest here where Stevens has not met her initial burden of showing that she is being forced to choose to follow the tenets of her religion or face criminal prosecution. She does not allege that any religious belief or practice of hers requires her to convert other people's money for her benefit on false pretenses, not does she allege that any religious belief is implicated at all. She instead argues that in general terms her Roma beliefs are burdened by the prosecution of this case based on her inability to practice her spiritual healing practices without government intervention. But that is too attenuated under RFRA

24

because there are plenty of alternatives for Stevens to practice her religion without engaging in a scheme to defraud another observer of her faith. There is no substantial burden where a regulation or statute only prohibits one possible method of engaging in a particular religion, while leaving other available alternatives unaffected. *Weir*, 114 F.3d 817; *Bryant v. Gomez,* 46 F.3d 948 (9th Cir. 1995) (no "substantial burden" where alternatives were available to allow religious practices to be followed); *Kiczenski v. Gonzales,* 237 F. App'x 149, 151 (9th Cir. 2007) (defendant's "[RFRA] challenge failed because he was unable to demonstrate the Controlled Substances Act's limitation on hemp cultivation would be a substantial burden on his broad ability to practice plant cultivation as a religious exercise").

As one court has explained, "if the mere fact of prosecution were enough to trigger a substantial burden, every criminal Defendant raising a RFRA claim would be able to succeed on this element, rendering the substantial burden portion of the RFRA test superfluous in criminal cases." *United States v. Jeffs,* 2016 WL 6745951, at *7 (D. Utah Nov. 15, 2016). This aspect of the motion is thus meritless and may be summarily denied.

### *(2)  Free Exercise under the First Amendment*

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press..." It is well established that the nearly absolute constitutional protection afforded freedom of religious belief does not extend without qualification or limitation to all religious conduct. While an individual is free to

believe in whatever they choose under the auspices of religion, their conduct, especially as it pertains to injuries committed to others, remains subject to scrutiny. In other words, religious conduct remains subject to regulation for the protection of society. *See Cantwell v. Connecticut,* 310 U.S. 296, 303-04 (1940).

The Supreme Court has determined that the enforcement of criminal laws can be constitutionally achieved even if the neutral application of those laws implicates the religious practices of individuals.  "Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. Certainly penal laws are available to punish such conduct. Even the exercise of religion may be at some slight inconvenience in order that the state may protect its citizens from injury." *Id*. at 306.

Hence, reliance on religious practices to commit fraud upon a victim is not privileged under the free exercise clause. Stevens is free to worship however she wishes. She is not, however, permitted to defraud others under the guise of exercising her religious beliefs. Where an individual violates an otherwise valid criminal statute, the First Amendment does not act as a shield to preclude the prosecution of that individual simply because their criminal conduct has a connection to religious activity.  *United States v. Friday,* 525 F.3d 938 (10th Cir. 2008).  If affirmative misrepresentations or material non-disclosures are carried out concerning the uses of funds obtained from another, with intent to defraud, then those fraudulent acts may be subject to criminal prosecution. *See, e.g., United States v. Rasheed,* 663 F.2d

843, 847 (9th Cir. 1981) ("The First Amendment does not protect fraudulent activity performed in the name of religion.").

The jury must, of course, determine that her conduct was carried out with fraudulent intent.  Defendant may present a defense that she was simply pursuing her religious practices, which may be antithetical with criminal intent.  If the jury finds her belief to be sincere, she may be acquitted.  But that is a matter for trial, not for a motion to dismiss.  The motion should be DENIED on this basis as well.

### C. *Selective Prosecution Defense Does not Warrant Dismissal*

Defendant finally seeks dismissal of the indictment on grounds of selective prosecution, blusterously arguing that this indictment seeks to criminalize certain religious practices while leaving others untouched.  Though initially appealing, that final argument ultimately lacks merit and does not warrant dismissal.  The government persuasively distinguishes general fundraising for religious activities or purposes from the type of specific fraudulent scheme at issue in this case.  Stevens's theory of selective religious prosecution does not pass muster.

Federal prosecutors have "broad discretion" in enforcing criminal laws and a "presumption of regularity" attaches to their prosecutorial decisions. *United States v. Armstrong,* 517 U.S. 456, 464 (1996). This discretion is subject to constitutional constraints and the guarantee of equal protection under the Fifth Amendment.  So a a prosecution based on an "unjustifiable standard such as race, religion, or other arbitrary classification" is prohibited and subject to dismissal.  *Id.*

But a defendant who seeks to establish a claim of selective prosecution carries a "demanding" burden. *United States v. Smith,* 231 F.3d 800, 807 (11th Cir. 2000) (quoting Armstrong, 517 U.S. at 463); *United States v. Jordan,* 635 F.3d 1181, 1188 (11th Cir. 2011). Hence, "in order to dispel the presumption that prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary." *Smith*, 231 F.3d at 807 (emphasis in original) (quoting *Armstrong,* 517 U.S. at 465); *Jordan*, 635 F.3d at 1188.

Stevens argues that the statute prohibiting wire fraud has been selectively enforced against her because of her unique Roma ethnicity and religion. In support of this argument, the defendant, in a conclusionary fashion, argues that "[s]imilarly situated individuals are not prosecuted for the same conduct and the differential treatment could only be based on Ms. Stevens' ethnicity and religion." [D.E. 31 at 23]. But Stevens has offered no evidence, let alone clear and convincing evidence, that she has been selectively prosecuted. Moreover, she has not offered evidence of any other similarly situated individuals who were not prosecuted, which on its face is fatal to any such claim seeking dismissal of an otherwise valid indictment. *See Smith,* 231 F.3d at 810-11. She merely argues that because the government does not prosecute all religious groups for accepting donations, or tithes, to the organizations, that the prosecution against her is discriminatory.

This argument is a non-starter. The indictment alleges that Stevens fraudulently induced the victim to provide her money to remove curses and "clean the money." This money was not alleged to be a donation to Stevens. She is not a

charitable organization governed under 26 U.S.C. § 501(c)(3).  The indictment alleges that, after converting the victim's money, Stevens used it for her and her co-defendant's private interests, including gambling in Las Vegas. Clearly, this was not a religious nor a charitable purpose. According to the government, Stevens is being prosecuted, not because of her religious beliefs, but because of her scheme to defraud the victim in this case.  For purposes of a motion to dismiss, the showing of selective prosecution under these circumstances has not been satisfied.  Accordingly, the motion should also be DENIED on this score.

## IV.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's second motion to dismiss the Government's indictment [D.E. 61] should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have until May 3, 2022 to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Comm'r of Soc. Sec.,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 2d day of May, 2022.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge